**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MARK MANNING, ET AL.,<br>    *Plaintiffs*,<br><br>    v.<br><br>COMMUNITY SOLUTIONS, INC.<br>    *Defendant.* | No. 3:20-cv-00337 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Mark Manning and George Chelso ("Plaintiffs") have sued Community Solutions, Inc. ("Defendant," "Community Solutions," or "CSI") and Sherry Albert, Chief Operating Officer of Community Solutions, following their termination from employment, for breach of contract and violation of Connecticut General Statutes § 31-51q. Ex. B to Notice of Removal ¶ 1, ECF No. 1-2 (Mar. 12, 2020) ("Am. Compl.").[1] Defendant has filed a motion for summary judgment.

For the following reasons, the Defendant's motion for summary judgment is

**GRANTED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

Community Solutions is a "non-profit organization that promotes self-reliance, responsibility and accountability for at risk and disadvantaged youth a[n]d adults." Local R. 56A

---

[1] In their Amended Complaint, Plaintiffs accused Ms. Albert of violating Connecticut General Statutes § 31-51q. Am. Compl. ¶¶ 34–43. In its Ruling and Order on the motion to dismiss, the Court dismissed the counts against Ms. Albert after Plaintiffs agreed to dismissal because there is no individual liability under Connecticut General Statutes § 31-51q. Ruling and Order on Mot. to Dismiss at 6–7, ECF No. 32 (Sept. 30, 2021).

[2] The factual allegations are taken from Plaintiffs' Amended Complaint, Defendant's Local Rule 56(a) Statements, Plaintiffs' Local Rule 56(a) Statement, and supporting exhibits filed by all parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an

Statement ¶ 1, ECF No. 35-1 (Feb. 2, 2022) ("Def.'s 56(a)(1) Statement"); Ex. A to Local R.

56A Statement ¶ 3, ECF No. 35-3 (Feb. 4, 2022) ("Black Aff.") (affidavit of Christine Black).

Community Solutions runs the Chase Center, one of its "residential work release[] and re-entry

centers," which provides substance abuse counseling, education and job search assistance, and

other "services for ex-offenders integrating into the community." Def.'s 56(a)(1) Statement ¶ 2;

*see also* Black Aff. ¶ 4.

Mr. Manning began working as an employee for Community Solutions in November

2007 in the role of Counselor Supervisor. Def.'s 56(a)(1) Statement ¶ 3; Ex. B to Local R. 56A

Statement at 22–23, ECF No. 35-4 (Feb. 4, 2022) ("Manning Dep.") (deposition of Mark

Manning).[3] About six months later, Mr. Manning was promoted to Program Director, a position

in which he was responsible for supervising all staff at Community Solutions's Chase Center.

Def.'s 56(a)(1) Statement ¶ 3; Manning Dep. at 26–27. Mr. Manning held the position of

Program Director until his termination from employment on June 22, 2018. Def.'s 56(a)(1)

Statement ¶¶ 3, 35; Manning Dep. at 26–27; Am. Compl. ¶ 7; Ex. L to Def.'s Reply to Pls.' Obj.

to Mot. for Summ. J. at 2, ECF. No. 41-1 (Mar. 25, 2022) ("Ex. L") (Mr. Manning's termination

letter).

Mr. Chelso began his employment at Community Solutions in February 2013 as a

Counselor Supervisor, a role in which he assumed responsibility for "supervising the Human

Service Workers at the Chase Center." Def.'s 56(a)(1) Statement ¶ 4; Ex. C to Local R. 56A

---

objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule
56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1)
Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each
admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R.
56(a)(2)–56(a)(3).

[3] The cited pagination refers to the page numbers provided in the transcript for the Manning deposition. For all other
documents, the Court refers to the page number assigned by the Electronic Filing System.

Statement at 22–23, 26, ECF No. 35-5 (Feb. 4, 2022) ("Chelso Dep.") (deposition of George Chelso).[4] About one year into his time at Community Solutions, Mr. Chelso requested and was made a Court Liaison for a different Community Solutions program. Def.'s 56(a)(1) Statement ¶ 4; Chelso Dep. at 28–29. He requested the different role because "it had better hours." Def.'s 56(a)(1) Statement ¶ 4. On or around July 25, 2017, Mr. Chelso was promoted back to his previous position as Counselor Supervisor at the Chase Center. Def.'s 56(a)(1) Statement ¶ 4; Chelso Dep. at 30–31; Ex. D to Local R. 56A Statement, ECF No. 35-6 (Feb. 4, 2022) (Mr. Chelso's offer letter). Mr. Chelso held that position until his termination from employment on June 22, 2018. Def.'s 56(a)(1) Statement ¶ 35; Chelso Dep. at 30–31; Ex. L at 3 (Mr. Chelso's termination letter).

Ms. Albert began employment at Community Solutions in February 2002 and has served as the company's Chief Operating Officer since February 2013. Def.'s 56(a)(1) Statement ¶ 5; Ex. E to Local R. 56A Statement ¶ 3, ECF No. 35-7 (Feb. 4, 2022) ("Albert Aff.") (affidavit of Sherry Albert). Ms. Albert did not directly supervise Mr. Manning or Mr. Chelso at any point during their employment at Community Solutions.[5] Def.'s 56(a)(1) Statement ¶ 6; Local R. 56(a)(2) Statement of Facts in Opp'n to Summ. J., ECF No. 38 (Mar. 1, 2022) ("Pls.' 56(a)(2) Statement").

---

[4] The cited pagination refers to the page numbers provided in the transcript for the Chelso deposition. For all other documents, the Court refers to the page number assigned by the Electronic Filing System.

[5] The parties appear to disagree in part on this fact. Community Solutions states that Ms. Albert "never supervised [Mr.] Manning or [Mr.] Chelso during their tenures of employment." Def.'s 56(a)(1) Statement ¶ 6. Plaintiffs, however, admit that statement in part and deny it in part. Pl.'s 56(a)(2) Statement ¶ 6. Instead, they state that Ms. Albert "never directly supervised [Mr.] Manning or [Mr.] Chelso." *Id*. Mr. Manning's deposition, which both parties cite, indicates that Mr. Manning reported to Tom O'Connor, who reported to Liz Weiblen, who in turn reported to Ms. Albert. Manning Dep. at 28–29. Mr. Chelso, like Mr. Manning, also stated that Ms. Albert was never his "direct supervisor." Chelso Dep. at 33. He also said that he was unsure as to exactly which position Ms. Albert held but that "the way [he] understood it, she was the person in charge." *Id*. at 32:25–33:11.

Christine Black began employment at Community Solutions in January 2017 as an HR Generalist, and was promoted to HR Administrator in November 2017. Def.'s 56(a)(1) Statement ¶ 8; Black Aff. ¶ 6. On August 19, 2019, after "several" subsequent promotions, Ms. Black became Director of Human Resources (now called Chief Human Resources Officer), which remains her current role. *Id.*

New employees at Community Solutions receive a copy of its Personnel Policies at the start of their employment, and annually thereafter. Def.'s 56(a)(1) Statement ¶ 9. The Personnel Policies include the following language:

> This policy does not create an express or implied contract of employment. CSI does not recognize any contract of employment unless in writing and signed by the Chief Executive Officer and the employee. Employment with CSI is At-Will and either party may terminate the employment relationship at any time with or without cause.

Ex. F to Local R. 56A Statement at 2, ECF. No. 35-8 (Feb. 4, 2022) ("Ex. F") (Personnel Policies); *see also* Def.'s 56(a)(1) Statement ¶ 10.

The Personnel Policies also provide, at Section 2.1.15, that "as is true at all times during an employee's employment with CSI, employment is not for any specific time and may be terminated at will, with or without cause and without prior notice." Ex. F at 3; Def.'s 56(a)(1) Statement ¶ 11. In addition, Section 2.5.7 codifies Community Solutions's Code of Ethics and states that "[v]iolations of the Code of Ethics will result in disciplinary action, up to and including termination." Ex. F at 4–6; *see also* Def.'s 56(a)(1) Statement ¶ 12. Further, the Personnel Policies' section that details the types of potential disciplinary actions states that Community Solutions "specifically maintains its right to bypass any or all of these steps and move to immediate termination at its sole discretion." Ex. F at 8; *see also* Def.'s 56(a)(1) Statement ¶ 13.

4

The accompanying Policy Review Acknowledgment Form, which both Plaintiffs signed, states, "I understand that the CSI Personnel Policies is a summary and not intended to cover all topics or circumstances. CSI reserves the right to respond to specific situations in whatever manner best suits the needs of CSI and the employee(s) involved." Def.'s 56(a)(1) Statement ¶ 14–16; Ex. G to Local R. 56A Statement at 2–3, ECF No. 35-9 (Feb. 4, 2022) ("Ex. G"). The Policy Review Acknowledgment Form also states, "I understand these policies do not create an express or implied contract of employment. CSI does not recognize any contract of employment unless in writing and signed by the Chief Executive Officer and the employee. Either party may terminate the employment relationship at any time." *Id*.

On May 20, 2014, Mr. Chelso sent Ms. Albert an e-mail requesting a "discreet dinner meeting" with her to discuss "a lot of questions and comments regarding CSI." Ex. H to Local R. 56A Statement at 2, ECF No. 35-10 (Feb. 4, 2022) ("Ex. H"); *see also* Def.'s 56(a)(1) Statement ¶ 17. Mr. Chelso testified that he wrote that e-mail "because he was not sure if his moral compass was in the same direction as hers." Def.'s 56(a)(1) Statement ¶ 18; *see also* Ex. H at 2. Mr. Chelso also claims that he had concerns about prior Prison Rape Elimination Act ("PREA") complaints "and was alarmed at how they were handled." Def.'s 56(a)(1) Statement ¶ 18; *see also* Chelso Dep. at 55, 62–65.

Mr. Chelso and Ms. Albert met on June 19, 2014. Def.'s 56(a)(1) Statement ¶ 19; Albert Aff. ¶ 6. The parties' accounts of that meeting differ. Community Solutions states that Mr. Chelso "had general questions about how things worked in the agency and appeared to be focused on what career opportunities may be available to him." Def.'s 56(a)(1) Statement ¶ 19. Plaintiffs deny that characterization of the meeting. Pls.' 56(a)(2) Statement ¶ 19. Plaintiffs claim that Mr. Chelso actually "discussed his alarm with how PREA violations were being handled."

Pls.' 56(a)(2) Statement ¶ 19; *see also* Chelso Dep. at 62–63. The parties agree, however, that the only management practice Mr. Chelso claims to have raised at the meeting with Ms. Albert was the handling of PREA issues. Def.'s 56(a)(1) Statement ¶ 20; Pls.' 56(a)(2) Statement ¶ 20; Chelso Dep. at 65.

On February 25, 2015, Mr. Manning filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities (the "2015 CHRO Charge") against Community Solutions. Def.'s 56(a)(1) Statement ¶ 22; Ex. I to Local R. 56A Statement, ECF No. 35-11 (Feb. 4, 2022) ("Ex. I") (Affidavit of Illegal Discriminatory Practice). In the 2015 CHRO Charge, Mr. Manning "complain[ed] about discriminatory employment practices and alleged that [he] was given a poor evaluation and was earning a different rate of pay based on his race and color." Def.'s 56(a)(1) Statement ¶ 22. Mr. Manning claims that Community Solutions subsequently sought to rectify the issue with his pay by reallocating money allotted for staff bonuses toward pay increases for managers. Def.'s 56(a)(1) Statement ¶ 23; *see also* Pls.' 56(a)(2) Statement ¶ 55; Manning Dep. at 58–59. Mr. Manning testified that this action "sent shockwaves through the agency" and that agency staff were "furious." Manning Dep. at 58–59.

Mr. Manning also alleges that he was terminated in retaliation for filing the 2015 CHRO Charge and for being an outspoken critic of management practices, and for speaking out about "intimidation, back-stabbing, miscommunication, needing approval to issue discipline[,] and overall micro-management." Def.'s 56(a)(1) Statement ¶¶ 24–25; Manning Dep. at 52–54, 55–65. Mr. Manning believes that he was retaliated against for other reasons, too. Pls.' 56(a)(2) Statement ¶ 25.

6

In June 2018, Ms. Black began an investigation into practices at the Chase Center. Def.'s 56(a)(1) Statement ¶ 26. According to Community Solutions, Ms. Black commenced this investigation in response to a complaint from an employee at the Chase Center, which alleged that Mr. Manning yelled and swore at the employee after the employee reported a possible PREA violation to the human resources department. *Id*.; Black Aff. ¶ 8. According to Ms. Black, the employee's complaint "alluded to a hostile and intimidating work environment." Def.'s 56(a)(1) Statement ¶ 27. Ms. Black also stated that the employee reported that Mr. Chelso "was believed to have had knowledge of this incident and was covering it up." Black Aff. ¶ 9. Ms. Black stated that she became concerned that management at the Chase Center was "purposefully deflecting HR involvement," and so she started an investigation. Def.'s 56(a)(1) Statement ¶ 27; Black Aff. ¶ 10.

Plaintiffs dispute that account of the investigation's origins. First, Plaintiffs state that they "lack knowledge as to why [Ms.] Black began an investigation and what the employee accused [Mr.] Chelso of doing." Pls.' 56(a)(2) Statement ¶ 26. Plaintiffs both testified that they never violated Community Solutions's "personnel code." *Id*. ¶¶ 26–27; Manning Dep. at 88–91; Chelso Dep. at 96–98.

Second, Plaintiffs claim that Mr. Manning himself prompted the investigation at issue when he reported a concern about "undue familiarity" to his direct supervisor, Tom O'Connor. Pls.' 56(a)(2) Statement ¶ 43. Plaintiffs state that this reporting process was consistent with Community Solutions's "normal operating procedures." *Id*. ¶ 26. According to Mr. Manning, he reported this undue familiarity incident "[o]n or around May 2018" to Mr. O'Connor, after one of his subordinates, Mike Siegel, reported the incident to him. Pls.' 56(a)(2) Statement ¶ 43; Manning Dep. at 31–33.

Mr. Manning claims that Mr. O'Connor told him human resources would investigate the incident as a PREA investigation and that it did, in fact, result in an internal investigation into the incident. Pls.' 56(a)(2) Statement ¶ 26, 43; Manning Dep. at 31–33. According to Plaintiffs, the investigation was led by Martha Klebart, a human resources manager at Community Solutions, and also involved Community Solutions's PREA coordinator, Kristin Cappalletti. Pls.' 56(a)(2) Statement ¶ 44; Manning Dep. at 31–33. Mr. Manning testified that Community Solutions then referred the investigation to the Connecticut Department of Correction. Pls.' 56(a)(2) Statement ¶ 44; Manning Dep. at 34–35. Ms. Black's affidavit states that Mr. Manning "[n]ever came to [her] to express [h]is dissatisfaction with the way CSI managed its programs," and that "[t]o the contrary, the Chase Center investigation was initiated because of complaints about the way [Mr.] Manning was managing his program at the Chase Center." Black Aff. ¶ 20.

On June 8, 2019, Plaintiffs were placed on paid administrative leave. Def.'s 56(a)(1) Statement ¶ 28; Ex. K to Local R. 56A Statement, ECF No. 35-13 (Feb. 4, 2022) (letters placing Plaintiffs on administrative leave). The parties disagree on the reasons why Plaintiffs were placed on leave. According to Community Solutions, Plaintiffs were put on leave pending completion of the investigation that resulted from the employee complaint because Ms. Black was "concerned that [P]laintiffs may have [been] deflecting HR involvement" and "wanted to be sure that the staff felt comfortable and spoke candidly about their experiences [at] the Chase Center." Def.'s 56(a)(1) Statement ¶ 28; *see also* Black Aff. ¶ 11. Plaintiffs allege that neither one "was ever told the reason for being placed on administrative leave," and that Ms. Black is only now providing this reason for placing them on administrative leave. Pls.' 56(a)(2) Statement ¶ 28.

Instead, Plaintiffs allege that, on June 8, 2018, Ms. Black and Ms. Klebart "appeared in [Mr.] Manning's office unexpectedly and informed him that he was being placed on administrative leave while they investigated program activities." Pls.' 56(a)(2) Statement ¶ 45; Manning Dep. at 36. According to Plaintiffs, Mr. Manning asked if he was the subject of the investigation, and Ms. Klebart told him he was not. Pls.' 56(a)(2) Statement ¶ 45; Manning Dep. at 35–36. Mr. Manning claims he was never told the topic or subject of the investigation, only that "they were investigating activities of the program." Pls.' 56(a)(2) Statement ¶ 46; Manning Dep. at 36: 18–19. Mr. Chelso claims that Ms. Black and Ms. Klebart also placed him on administrative leave without telling him the reasons for doing so. Pls.' 56(a)(2) Statement ¶ 56; Chelso Dep. at 34–36. Plaintiffs state that employees placed on administrative leave at Community Solutions were "generally told why." Pls.' 56(a)(2) Statement ¶ 52.

Over the following days, Ms. Black "interviewed and obtained statements from approximately 20 Chase Center staff, including [Mr.] Chelso." Def.'s 56(a)(1) Statement ¶ 29; *see also* Black Aff. ¶ 12. The information obtained "substantiated [Ms. Black's] suspicion that the staff at the Chase Center were being belittled and harassed for contacting HR for support and guidance," in violation of Community Solutions's Personnel Policies and Code of Ethics. Def.'s 56(a)(1) Statement ¶ 29; Black Aff. ¶ 14. Ms. Black states that she attempted to interview Mr. Manning, but that "he refused to answer questions without his attorney present." Black Aff. ¶ 13.

Upon conclusion of the investigation, Ms. Black made disciplinary recommendations to Fernando Muniz, Chief Executive Officer of Community Solutions, and Ms. Albert. Def.'s 56(a)(1) Statement ¶ 30; Black Aff. ¶ 15. Ms. Black recommended that Mr. Manning, Mr. Chelso, and two other employees (Jeffrey Brown and Alexandra Levesque) be terminated, and that employees Olysha Staten and Staci Broadnax be issued written reprimands. Def.'s 56(a)(1)

Statement ¶ 31; Black Aff. ¶ 15. Mr. Muniz and Ms. Albert authorized the recommended discipline. Def.'s 56(a)(1) Statement ¶ 32; Black Aff. ¶ 16.

Community Solutions claims that Ms. Albert was "not actively involved in the Chase Center Investigation" besides her authorization of the recommended discipline. Def.'s 56(a)(1) Statement ¶ 33. According to Community Solutions, Ms. Albert "did not request or initiate the investigation, conduct any interviews, gather any information[,] or ma[k]e any conclusions or recommendations to discipline." *Id*.; *see also* Black Aff. ¶ 17; Albert Aff. ¶ 8. Plaintiffs deny that characterization, alleging that Ms. Albert "had to approve whenever any[o]ne got put on administrative leave." Pls.' 56(a)(2) Statement ¶ 33. Plaintiffs also allege that Ms. Albert was "involved in the interview of and the decision to terminate [Mr.] Manning." *Id*.; Manning Dep. at 38.[6]

Community Solutions claims that Ms. Black was not aware of Mr. Chelso's 2014 meeting with Ms. Albert or Mr. Manning's 2015 CHRO Charge and that Ms. Black did not rely on those factors in making her recommendation to terminate Plaintiffs. Def.'s 56(a)(1) Statement ¶ 34; Black Aff. ¶¶ 18–19. Plaintiffs deny that claim, but do not provide facts to support their denial. Pls.' 56(a)(2) Statement ¶ 34.

On June 21, 2018, Mr. Manning claims to have received a call from Ms. Black asking to meet alone on June 22, 2018, at 8:00 AM. Pls.' 56(a)(2) Statement ¶ 47; Manning Dep. at 37–38. Also on that day, according to Plaintiffs, Ms. Black interviewed Mr. Chelso by phone and asked him when he first became aware of a PREA incident at the Chase Center and of the Chase

---

[6] Community Solutions also states that Ms. Albert "did not play any role in Ms. Black's investigation, recommendations[,] or ultimate authorization for the discipline meted out." Def.'s 56(a)(1) Statement ¶ 42. However, Plaintiffs deny that statement, noting that affidavits from both Ms. Albert and Ms. Black state that Ms. Albert, along with Mr. Muniz, authorized Ms. Black's recommendation to terminate Plaintiffs. *See* Pl.'s 56(a)(2) Statement ¶ 42; Albert Aff. ¶ 10; Black Aff. ¶ 16.

Center's working environment. Pl's 56(a)(2) Statement ¶ 57; Chelso Dep. at 38–40. Plaintiffs claim that Mr. Chelso complained to Ms. Black that she was "forcing him to answer her questions in an unfair manner by conducting a spur of the moment interview" and that he was denied access to "notes about pertinent incidents." Pl's 56(a)(2) Statement ¶ 57; Chelso Dep. at 40.

On June 22, 2018, Plaintiffs were both terminated. Def.'s 56(a)(1) Statement ¶ 35; Ex. L at 2–3 (termination letters). According to Plaintiffs, when Mr. Manning arrived at Ms. Black's office for their 8:00 a.m. meeting, Ms. Black "unexpectedly informed him" that Ms. Albert would be joining their meeting. Pls.' 56(a)(2) Statement ¶ 48; Manning Dep. at 37–38. Plaintiffs allege that, when Ms. Albert arrived, Ms. Black and Ms. Albert began explaining why they were meeting with him, and Mr. Manning indicated that he "needed to consult [his] attorney." Manning Dep. at 37–39; *see also* Pls.' 56(a)(2) Statement ¶ 48. Plaintiffs claim that Ms. Black and Ms. Albert then "tried to convince [Mr.] Manning that he did not need an attorney to answer their questions, but he refused to acquiesce." Pls.' 56(a)(2) Statement ¶ 48; *see also* Manning Dep. at 38. According to Mr. Manning, the meeting concluded with Ms. Albert and Ms. Black leaving Ms. Black's office, returning "two minutes later" with a termination letter for Mr. Manning, and giving the letter to Mr. Manning. Pls.' 56(a)(2) Statement ¶ 49; Manning Dep. at 38. Plaintiffs claim that Ms. Black and Ms. Albert also met with Mr. Chelso on that day and "informed him that he was being terminated without telling him why." Pls.' 56(a)(2) Statement ¶ 58; Chelso Dep. at 45–47.

On December 21, 2018, Mr. Manning filed a second CHRO complaint ("2018 CHRO Charge") alleging retaliatory discrimination. Ex. J to Local R. 56A Statement at 4, 8, ECF No.

35-12 (Feb. 4, 2022) (Affidavit of Illegal Discriminatory Practices). The CHRO dismissed the complaint as untimely. *Id*.

Plaintiffs deny Community Solutions's stated reason for Ms. Black's disciplinary recommendations. Pls.' 56(a)(2) Statement ¶ 30. Mr. Manning testified "that his termination was unlawful because he was not told specifically what he did," and that he "does not believe he violated any of the policies cited to by CSI." Def.'s 56(a)(1) Statement ¶¶ 36–37. He claims to have not learned "the factual basis for his termination until this litigation." Pls.' 56(a)(2) Statement ¶ 51; Manning Dep. at 45–50. Mr. Manning also notes that "CSI's standard operating procedure for a termination or an investigation was to include a person's direct supervisor in the decision-making process," but that Community Solutions did not include his direct manager, Tom O'Connor, in either the investigation or the termination. Pls.' 56(a)(2) Statement ¶ 53. Rather, according to Mr. Manning, the investigation was "concocted [by Ms. Albert] as her way to get rid of him because she is 'vindictive'" and, along with others at Community Solutions, "held a discriminatory animus against him" around the time of the 2015 CHRO Charge. Def.'s 56(a)(1) Statement ¶¶ 38–39; Pls.' 56(a)(2) Statement ¶¶ 38–39, 54–55. Ms. Albert allegedly "attempted to intimidate [Mr.] Manning on at least one occasion." Pls.' 56(a)(2) Statement ¶ 54; Manning Dep. at 52. He notes that Ms. Klebart "also clashed with him during the time his 2015 CHRO [Charge] was being litigated. Pls.' 56(a)(2) Statement ¶ 39; Manning Dep. at 57–58. He further adds that the investigation "was handled horribly" and that Ms. Black did not "do any follow up and did not provide a proper summary or conclusion and that she failed [to] cite to any specific events in the termination letter." Pls.' 56(a)(2) Statement ¶ 37.

Mr. Chelso believes that "Ms. Black's investigation was not conducted properly" and that "his termination was not warranted because he did not do anything to warrant termination."

12

Pls.' 56(a)(2) Statement ¶ 40; Chelso Dep. at 43, 46–49, 52–53, 76–77, 96–98 (criticizing various aspects of the investigation and the decision to terminate). Mr. Chelso identified Ms. Albert as an employee "who harbored a discriminatory animus" against him because of their June 19, 2014 conversation. Pls.' 56(a)(2) Statement ¶ 41. Mr. Chelso believes that he was terminated unlawfully for one of the following reasons: in retribution for his June 19, 2014 conversation with Ms. Albert, because of Mr. Manning's 2015 CHRO Charge against Community Solutions, or because of his age. Pls.' 56(a)(2) Statement ¶ 21; *see also* Chelso Dep. at 53:12–22 (alleging that Mr. Manning was fired because of a case Mr. Manning had filed against Community Solutions "about his pay and discrimination" and that Mr. Chelso was fired "because obviously he doesn't get along with anybody, and it seems like he swears all the time"); *id.* at 55:6–12 ("I don't know whether it was our age, that we're the oldest guys in the house. I don't know if it's about prior experiences I had with [Ms. Albert], where I wrote her an e-mail because I wasn't sure if my moral—my compass was in the same direction as hers."); *id.* at 59:9–13 ("It was either retribution from my prior conversations with [Ms. Albert], retribution because of [Mr. Manning's] prior case, or because we're the oldest people in the house. Unless somebody admits to me the real reason, I got to go with those three.").

Mr. Chelso also notes that he had "previously contemplated reporting PREA violations to the Connecticut Department of Corrections and the Federal Bureau of Prisons as he believed the law required him to do, and he expressed that intent to [Ms.] Albert on a previous occasion." Pls.' 56(a)(2) Statement ¶ 60; *see also* Chelso Dep. at 67:17–69:1 ("Q: Who do you believe perceived you to be about to take these complaints to DOC? A: Sherry. She's the only one that knew. I only talked to her. . . . Q: So it is your contention that you were terminated to prevent you from going to DOC? A: That's one of the reasons, I believe."). He stated that he "was

13

contemplating taking that step with the PREA investigation that CSI was conducting in June 2018" and that this was one of the reasons for his termination. Pls.' 56(a)(2) Statement ¶ 60; Chelso Dep. at 66–68. Mr. Chelso testified that "CSI actively discouraged employees from reporting PREA violations to the Connecticut Department of Correction[], the Federal Bureau of Prisons, or the police and that he believed that CSI would terminate anyone who did because it would have affected their funding." Pls.' 56(a)(2) Statement ¶ 61, *see also* Chelso Dep. at 101–03.

To explain the gap of time between the 2014 conversation and his termination, Mr. Chelso notes that he "used to exchange e-mails all the time" with Ms. Albert and that she "would solicit [his] opinions on a subject" but that he "never heard from her again after that day." Chelso Dep. at 94:15–25.

### B.  Procedural History

On October 3, 2019, Plaintiffs filed their initial Complaint in the Connecticut Superior Court, Judicial District of Hartford. *See Manning v. Cmty. Sols., Inc.*, No. HHD-cv-19-6118039-S (Conn. Super. Ct. Oct. 3, 2019); *see also* Ex. A to Notice of Removal, ECF No. 1-1 (Mar. 12, 2020) ("Initial Compl."). The Initial Complaint alleged four counts against Community Solutions and two counts against Ms. Albert. Initial Compl. ¶¶ 26–51.

On February 27, 2020, Plaintiffs filed an Amended Complaint in the Connecticut Superior Court, Judicial District of Hartford. Am. Compl.

On March 12, 2020, Defendants removed the action to this Court. Notice of Removal, ECF No. 1 (Mar. 12, 2020).

On March 17, 2020, Plaintiffs filed a motion to remand the action to state court. Pls.' Obj. to Removal to Fed. Ct., ECF No. 13 (Mar. 17, 2020).

On March 19, 2020, Defendants filed an opposition to Plaintiffs' motion to remand the action to state court. Defs.' Resp. to Pls.' Obj. to Removal, ECF No. 14 (Mar. 19, 2020).

On January 13, 2021, Defendants filed a motion to dismiss Plaintiffs' Amended Complaint in its entirety. Defs.' Mot.; Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Revised Compl., ECF No. 22-1 (Jan. 13, 2021). Defendants specifically moved to dismiss the allegations against Ms. Albert's violations of Connecticut General Statutes § 31-51q "because there is no individual liability under the relevant statute." *Id*. at 1.

On February 4, 2021, Plaintiffs filed an opposition to Defendants' motion to dismiss. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, ECF No. 24 (Feb. 4, 2021). Plaintiffs agreed to dismissal of the claims against Ms. Albert because they conceded there is no individual liability under Connecticut General Statutes § 31-51q. *Id*. at 5.

On February 19, 2021, Defendants filed a reply to Plaintiffs' opposition to their motion to dismiss. Reply to Pls.' Opp'n to Defs.' Mot. to Dismiss Revised Compl., ECF No. 25 (Feb. 19, 2021).

On March 30, 2021, the Court denied Plaintiffs' motion to remand. Ruling and Order on Mot. to Remand, ECF No. 27 (Mar. 30, 2021).

On September 30, 2021, the Court issued a Ruling and Order granting in part and denying in part Defendants' motion to dismiss. Ruling and Order on Mot. to Dismiss, ECF No. 32 (Sept. 30, 2021) ("Order"). In its Order, the Court dismissed the two counts against Ms. Albert. The Court also denied dismissal, without prejudice to renewal, for the remaining four counts against Community Solutions and stated that these claims would be addressed again following the close of discovery and renewal in the form of a summary judgment motion. *Id.* at 13.

On February 4, 2022, Community Solutions filed this motion for summary judgment. Def.'s Mot. for Summ. J., ECF No. 35 (Feb. 4, 2022) ("Def.'s Mot."); Def.'s 56(a)(1) Statement; Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 35-2 (Feb. 4, 2022) ("Def.'s Mem.").

On February 28, 2022, Plaintiffs filed their opposition to Community Solutions's motion for summary judgment. Pls.' Mem. of Law in Opp. to Def. Community Solutions, Inc.'s Mot. for Summ. J., ECF No. 37 (Feb. 28, 2022) ("Pls.' Mem."); Pls.' 56(a)(2) Statement.

On March 25, 2022, Community Solutions filed a reply to Plaintiffs' opposition. Def.'s Reply to Pls.' Obj. to Mot. for Summ. J., ECF. No. 41 (Mar. 25, 2022) ("Def.'s Reply").

On July 6, 2022, the Court held oral argument on Community Solutions's motion for summary judgment. Min. Entry, ECF No. 43 (Jul. 7, 2022).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247–48.

"[T]he substantive law will identify which facts are material." *Id*. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

16

1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*. "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir.

2013) (internal citation omitted). If there is any evidence in the record from which a reasonable

factual inference could be drawn in favor of the non-moving party for the issue on which

summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford*

*v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III. DISCUSSION

Community Solutions moves for summary judgment on all remaining counts of

Plaintiffs' Amended Complaint, which are Counts One, Two, Five, and Six, respectively: (1) the

breach of contract claim as to Community Solutions, Inc. re: Mr. Manning (Count One); (2) the

breach of contract claim as to Community Solutions, Inc. re: Mr. Chelso (Count Two); (3) the

violation of Connecticut General Statutes § 31-51q claim as to Community Solutions, Inc. re:

Mr. Manning (Count Five); and (4) the violation of Connecticut General Statutes § 31-51q claim

as to Community Solutions, Inc. re: Mr. Chelso (Count Six).[7]

Community Solutions argues that Plaintiffs' breach of contract claims fail because they

cannot establish existence of an employment contract, and that Plaintiffs' § 31-51q claims fail as

a matter of law.

The Court will address each of these arguments in turn.

### A. The Breach of Contract Claims

In its Ruling and Order on the motion to dismiss, the Court acknowledged that

Defendants "correctly point out that this district has previously granted motions to dismiss and

for summary judgment because of 'clear, express, and sufficiently conspicuous' disclaimers."

Order at 9 (quoting *Pribila v. Hyundai Motor Fin. Co.*, No. 3:05-CV-1852 (JCH), 2006 WL

2715218, at *2 (D. Conn. Sept. 21, 2006); citing *Cardona v. Aetna Life & Cas.*, 3:96-CV-1009,

---

[7] As noted above, *supra* n.1, the Court previously dismissed Count Three and Count Four of the Amended
Complaint, against Ms. Albert.

1998 WL 246634, at *5 (D. Conn. May 8, 1998)). The Court previously declined to dismiss the breach of contract claim because Plaintiffs had "not had an opportunity to raise potential counterarguments to the disclaimer [Community Solutions] identified in their reply brief, which was the first instance in which either party had provided a copy of the Personnel Policies." *Id*. (citing *Schain v. Blue Cross Blue Shield of Conn., Inc.*, No. CV 930349216, 1996 WL 634286, at *3 (Conn. Super. Oct. 21, 1996) ("Some courts have denied summary judgment when other facts[, other than an explicit disclaimer,] have raised a question as to the intention of the parties in forming an employment contract[.]")).

Plaintiffs now raise a single counterargument: that the language and practices used in Community Solutions's Code of Ethics, for which Community Solutions required a separate agreement, "negate[s] the effect of the disclaimer" by requiring employees to report certain behavior and promising no reprisal against employees who file reports. Pls.' Mem. at 6–7.

Community Solutions claims that Plaintiffs have not identified any evidence upon which a jury could find a "valid, binding employment contract," or any evidence that Community Solutions's Personnel Policies restricted it from terminating employees at will. Def.'s Mem. at 8. In support, they assert that, in Connecticut, contracts of permanent employees and of indefinite terms are "terminable at will by the employer." *Id*. (citing *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 464, 427A.2d 385 (1980)). Community Solutions acknowledges that statements in an employer's handbook or personnel policy manual may modify the presumption of at-will employment and give rise to a contractual relationship between employer and employee, *id*. (citing *Mangan v. Anaconda Indus, Inc.*, 193 Conn. 558 (1984)), but emphasizes that the existence of a handbook or personnel policy "does not automatically create a question of fact that

19

would defeat summary judgment," *id*. (citing *Davis v. Liberty Mut. Ins. Co.*, 218 F. Supp. 2d 256, 260 (D. Conn. 2002)).

Community Solutions also notes that "[t]he Second Circuit has . . . recognized that 'employers can generally insulate themselves from lawsuits by placing express disclaimers conspicuously in their personnel manuals that state it is not intended to create a contract or agreement between the employee and the employer and should not be interpreted as such.'" *Id*. (quoting *Pribila*, 2006 WL 2715218, at *2). According to Community Solutions, its Personnel Policies "contain conspicuous and repeated language that expressly disclaim CSI's intent to alter the at will nature of the employment relationship." *Id*. Specifically, they point to language which says:

> '[t]his policy does not create an express or implied contract of employment[,]' '[e]mployment with CSI is At-Will and either party may terminate the employment relationship at any time with or without cause,' '. . . as is true at all times during an employee's employment with CSI, employment is not for any specific time and may be terminated at will, with or without cause and without prior notice,' 'CSI specifically maintains its right to bypass any or all of these steps and move to immediate termination at its sole discretion.'

*Id*. at 8–9 (quoting Def.'s 56(a)(1) Statement ¶¶ 10–13). Additionally, Community Solutions notes, Plaintiffs also signed acknowledgement forms "that not only confirmed receipt of these policies, but . . . also contained its own verbiage disclaiming CSI's intent to create an employment contract." *Id*. at 9. These disclaimers, they say, state:

> 'I understand these policies do not create an express or implied contract of employment CSI does not recognize any contract of employment unless in writing and signed by the Chief Executive Officer and the employee. Either party may terminate the employment relationship at any time.'

*Id*. (quoting Def.'s 56(a)(1) Statement ¶¶ 14–16).

Finally, Community Solutions asserts that Plaintiffs' "at-will employment status was not altered or modified in any way" and that "[P]laintiffs have not submitted any evidence upon which a reasonable jury could find that CSI's Personnel Policies restricted their ability to terminate the [P]laintiffs at will." *Id.*

Plaintiffs respond that while Community Solutions's Personnel Policies did contain express disclaimers of a contractual relationship, and while Plaintiffs did acknowledge this disclaimer, "CSI used language and practices as to its Code of Ethics that negate the effect of the disclaimer." Pls.' Mem. at 6–7. Specifically, the Code of Ethics requires employees to

> 'report without reservation, any criminal or unethical behavior which could affect a client, another employee or the integrity of CSI. There will be no reprisal to employees who report violations of the Code of Ethics including incidents of waste, fraud, abuse, and any other questionable activities and practices.'

*Id.* at 7 (quoting Ex. F at 5). According to Plaintiffs, CSI "took specific steps to remove the binding nature of its Code of Ethics from the scope of its disclaimer by requiring employees to annually sign their agreement to it separately from their agreement as to the Personnel Policies." *Id.* The Code of Ethics, it goes on to argue, "unequivocally contains a contractual promise" to not reprise employees for reporting criminal or unethical behavior. *Id.* at 7–8. Plaintiffs argue that, at minimum, a jury should decide whether CSI removed the Code of Ethics agreement from its Personnel Policies. *Id.* at 7.

In reply, Community Solutions notes that Plaintiffs did not cite to any case law to support the argument that its Code of Ethics is separate from the disclaimer language of its Personnel Policies because employees were required to sign it separately. Def.'s Reply at 1. Community Solutions claims that it did not remove the Code of Ethics from the Personnel Policies "such that it is a separate and distinct document, and it is admittedly codified within [Community

Solutions's] Personnel Policies." *Id*. at 2 (citing Pls.' 56(a)(2) Statement ¶ 12; *Isaacs v. OCE Bus. Servs. Inc.*, 968 F. Supp. 2d 564 (S.D.N.Y. 2013) (holding that an arbitration agreement found within an employee handbook, that itself disclaims a contractual relationship, is enforceable "when the language of the arbitration agreement is distinct and mandatory and when the employee is advised of the policy and that compliance with it is a condition of employment" (internal citation and quotation marks omitted))). Defendant further notes that Plaintiffs do not cite to any evidence "suggesting that signing separate acknowledgement of the Code of Ethics was a pre-condition to employment or that re-signing annually was a mandatory condition to continued employment." *Id*. The Code of Ethics, they argue, "did not alter or modify Plaintiff's at-will employment status in any way." *Id*.

The Court agrees.

A reasonable jury could not conclude that an employment contract exists. "Under Connecticut law, employment contracts for indefinite terms are terminable at will by either party." *Pribila*, 2006 WL 2715218, at *2. Contracts may be expressly or impliedly created through language in an employer's personnel manual, but "employers can generally insulate themselves from lawsuits by placing express disclaimers conspicuously in their personnel manuals that state it is not intended to create a contract or agreement between the employee and employer, and should not be interpreted as such." *Id*.; *see also Cardona*, 1998 WL 246634, at *5 ("The Connecticut Supreme Court in *Finley* noted '[b]y eschewing language that could reasonably be construed as a basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals.'" (quoting *Finley v. Aetna Life & Cas. Co.*, 202 Conn. 190, 199 (1987), *rev'd on other grounds by Curry v. Burns,* 225 Conn.

782 (1993))); *Schain*, 1996 WL 634286, at *2 ("Cases following *Finley* have held that contract claims based solely on the terms of an employee handbook must fail if the handbook has an effective disclaimer.")).

Plaintiffs received an employee handbook with personnel policies that explicitly disclaimed a contractual agreement on the first page, which says,

> This policy does not create an expressed or implied contract of employment. CSI does not recognize any contract of employment unless in writing and signed by the Chief Executive Officer and the employee. Employment with CSI is At-Will and either party may terminate the employment relationship at any time with or without cause.

Ex. F at 2. Employees were also required to sign an annual policy review which again states,

> I understand these policies do not create an expressed or implied contract of employment. CSI does not recognize any contract of employment unless in writing and signed by the Chief Executive Officer and the employee. Either party may terminate the employment relationship at any time.

Ex. G at 2–3. The disclaimers were thus "sufficiently conspicuous" for Plaintiffs to know that there was no employee contract. *Pribila*, 2006 WL 2715218, at *2 (finding that the plaintiff's claims that he had rights under the employee handbooks was defeated by the fact that the handbooks "explicitly and repeatedly state that . . . employees are terminable at will at any time without cause" and that the plaintiff "was also asked to sign a form indicating that he had read and understood the policies contained in the employment manual, and that form again stated [the employer's] at-will policy").

Plaintiffs' argument that the Code of Ethics contains a contractual promise is unavailing. The Code of Ethics is laid out in the Personnel Policies, which begins and ends with the disclaimers discussed above. *See* Ex. F at 2–6. The Code of Ethics states that "[a]ll staff are required to review and sign the CSI Code of Ethics upon hire, annually thereafter, and as

required for disciplinary purposes." *Id*. at 4. Plaintiffs' claim that the Code of Ethics

unequivocally contains a contractual promise to not reprise employees for reporting criminal or

unethical behavior fails. There is no contractual agreement within this subsection of the

Personnel Policies, because there is no evidence that the parties reached an agreement to

establish a contract. *See Christensen v. Bic Corp.*, 18 Conn.App. 451, 458 (1989) ("A contractual

promise cannot be created by plucking phrases out of context; there must be a meeting of the

minds between the parties.").

The Code of Ethics is clearly located within the Personnel Policies that Plaintiffs

acknowledge contain disclaimers of a contractual relationship. For this reason, it is evident that

the parties understood that a contractual relationship did not exist. *See Davis*, 218 F. Supp. 2d at

262 (rejecting an argument in favor of identifying an implied contract where the plaintiff claimed

a contract was implied by provisions in the employee handbook discussing the company's

discipline policy and commitment to creating a respectful work environment, but the handbook

"contained explicit statements disclaiming contractual intent").

In any event, even if a contractual agreement could be read into the Code of Ethics, *see,*

*e.g.*, *Holt v. Home Depot, U.S.A., Inc.*, No. 3:00-CV-1578 (RNC), 2004 WL 178604, at *1 (D.

Conn. Jan. 22, 2004) (in an order deciding a motion for judgment as a matter of law, finding that

the jury could have reasonably found that the employer's "promise not to retaliate against

employees for using the open-door procedure was so clear, emphatic, highly touted, and widely

proclaimed that plaintiff could reasonably believe it was inviolable and thus not covered by

general disclaimers in the handbook and application"), Plaintiffs have not presented any

evidence upon which a jury could reasonably conclude that they were retaliated against for

"report[ing] violations of the Code of Ethics," Ex. F at 5. Mr. Chelso alleges that he was

terminated because of his June 19, 2014 conversation with Ms. Albert, which he claims

concerned his alarm about how PREA violations were handled; because of Mr. Manning's 2015

CHRO Charge against Community Solutions concerning discriminatory employment practices;

or because of Mr. Chelso's age. Pls.' 56(a)(2) Statement ¶ 21; *see also* Chelso Dep. at 53:12–22

(stating that Mr. Manning was fired because of a case Mr. Manning had filed against Community

Solutions "about his pay and discrimination" and that Mr. Chelso was fired "because obviously

he doesn't get along with anybody, and it seems like he swears all the time").

Mr. Manning, for his part, alleges that he was terminated because Ms. Albert is

"vindictive" and, along with others at Community Solutions, "held a discriminatory animus

against him" around the time of the 2015 CHRO Charge. Def.'s 56(a)(1) Statement ¶¶ 38–39;

Pls.' 56(a)(2) Statement ¶¶ 38–39, 54–55.

Although the Plaintiffs refer to conversations and complaints that they previously brought

up relating to issues outlined in the Code of Ethics, i.e., discrimination and inappropriate

relationships with clients, they "rely on conclusory allegations or unsubstantiated speculation."

*Robinson*, 781 F.3d at 44. The record does not contain any evidence in support of Plaintiffs'

claims that the June 2014 conversation and the February 2015 CHRO complaint led to their

termination in June of 2018. *See Anderson*, 477 U.S. at 250 ("If the evidence is merely colorable,

. . . or is not significantly probative, . . . summary judgment may be granted."); *cf. D'Andrea v.

Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019) (summary order) ("While we have declined to

draw 'a bright line to define the outer limits beyond which' temporal proximity may be

established, we have generally held that causation can only be inferred after the passage of a few

weeks or months, . . . and have held that a delay of more than a year is fatal to a showing of

causation . . . ." (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252

F.3d 545, 554 (2d Cir. 2001)).

Accordingly, summary judgment will be granted as to the breach of contract claims.

## B.  The Connecticut General Statutes § 31-51q Claims[8]

Connecticut General Statutes § 31-51q provides that:

> Any employer . . . who subjects any employee to discipline or
> discharge on account of the exercise by such employee of rights
> guaranteed by the first amendment to the United States Constitution
> or section 3, 4 or 14 of article first of the Constitution of the state,
> provided such activity does not substantially or materially interfere
> with the employee's bona fide job performance or the working
> relationship between the employee and the employer, shall be liable
> to such employee for damages caused by such discipline or
> discharge[.]

Conn. Gen. Stat. § 31-51q. To establish liability under this statute, Plaintiffs must show

"protected activity, adverse action, a causal relationship between the activity and the adverse

action, and that the protected activity did not interfere with the central purposes of the

employment relationship." *Winik-Nystrup v. Mfrs. Life Ins. Co.*, 8 F. Supp. 2d 157, 159 (D.

Conn. 1998); *see also McClain v. Pfizer, Inc.*, 692 F. Supp. 2d 229, 241 (D. Conn. 2010) (citing

the same).

"A clear prerequisite' to the application of § 31-51q . . . is that the speech at issue must be

constitutionally protected." *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 600 (2012)). "'To be

protected by the [F]irst [A]mendment, 'the speech must be on a matter of public concern, and the

---

[8] Because Plaintiffs' § 31-51q claims require interpretation of First Amendment law, this Court has federal question
jurisdiction over this case, removed from state court. *See, e.g.*, *Bracey v. Bd. of Educ. of Bridgeport*, 368 F.3d 108,
115–16 (2d Cir. 2004) (finding that the district court had jurisdiction over a plaintiff's claim under § 31-51q because
"a federal question was implicated on the face of his well-pleaded complaint," as the plaintiff had "allege[d] on the
face of his well-pleaded complaint that the Board [of Education] violated his rights as established, under section 31-
51q, by either the United States or the Connecticut Constitution," and noting that "[c]ourts construing section 31-
51q consistently look to federal First Amendment law to determine whether section 31-51q gives rise to a cause of
action in the cases before them").

employee's interest in expressing himself on this matter must not be outweighed by any injury the speech could cause' to employee relationships." *Emerick v. Kuhn*, 52 Conn. App. 724, 743 (1999) (quoting *Waters v. Churchill*, 511 U.S. 661, 668 (1994)). Statements of public concern are those "that can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 779 (1999) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). A court determines whether speech addresses a matter of public concern by "evaluating 'the content, form, and context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Connick*, 461 U.S. at 147–48).

At the summary judgment stage, Plaintiffs must bring forth evidence of a *prima facie* case of retaliation, where they show "(1) that the speech at issue was made as a citizen on matters of public concern rather than as an employee on [a] matter of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action." *Lynch v. Ackley*, No. 3:12-CV-537 (JBA), 2012 WL 6553649, *8 (D. Conn. Dec. 14, 2012) (internal citation and quotation marks omitted). If Plaintiffs establish their *prima facie* case, the burden shifts to Community Solutions to show a legitimate, non-retaliatory reason for the adverse action. *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215–16 (2d Cir. 2006). If Community Solutions provides a legitimate, non-retaliatory reason, the burden shifts to Plaintiffs to show that the proffered reason is a pretext for retaliation. *Id.*

Community Solutions argues that Plaintiffs' § 31-51q fails for three reasons: "(1) [P]laintiffs have failed to produce any evidence that they engaged in constitutionally protected activity; (2) [P]laintiffs have failed to produce any evidence of a causal connection between their claimed protected activity and their termination[;] and (3) [P]laintiffs have failed to produce any

evidence that the [D]efendant's preferred reason for their termination was pretext." Def.'s Mem. at 10.

The Court will address each of these arguments in turn.

### 1.  Plaintiffs' Engagement in Constitutionally Protected Activity

Community Solutions first argues that Plaintiffs "failed to produce any evidence that they engaged in constitutionally protected activity." *Id*. According to Community Solutions, neither Mr. Manning nor Mr. Chelso's speech involved matters of "public concern" safeguarded by § 31-51q. Speech involving a matter of public concern, it argues, "'involves statements that can be fairly considered as relating to any matter of political, social or other concern to the community.'" *Id*. at 11 (quoting *Daley*, 249 Conn. at 778–79 (internal citation omitted)).

Mr. Manning's 2015 CHRO Charge is not a matter of public concern, they argue, because it "concerned his personal complaint about discriminatory employment practices and alleged that he was given a poor evaluation and was earning a different rate of pay based on his race and color." *Id*. (emphasis omitted) (citing Def.'s 56(a)(1) Statement ¶ 22). Community Solutions argues that this "personal dispute" is not a matter of public concern. *Id*. (citing *Barlow v. Dep't of Pub. Health, Conn.*, 148 F. App'x. 31 (2d Cir. 2005) (summary order); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994); *Alexander v. Karosi*, No. CIV. 3:95-CV-2469 (AHN), 1996 WL 684387, at *5 (D. Conn. Aug. 12, 1996)).

According to Community Solutions, conversations Plaintiffs had with other employees about issues they had at CSI also are not protected conduct because Plaintiffs' statements "expressed concerns that were motivated by their personal dissatisfaction with the way CSI managed its programs," and these are "'purely private matter[s] . . . [that] do[] not pertain to a

matter of public concern.'" *Id*. at 12 (quoting *Lewis v. Cowen*, 165 F. 3d 154, 164 (2d Cir. 1999),
*cert. denied*, 528 U.S. 823 (1999); citing *Emerick*, 52 Conn. App. at 737). Specifically,
Community Solutions notes that Mr. Manning, at his deposition, "spoke of intimidation,
backstabbing, miscommunication and needing approval to issue discipline; conduct he
categorized collectively as 'micro-management.'" *Id*. (quoting Def.'s 56(a)(1) Statement ¶ 25).
"Likewise, [Mr.] Chelso's conversation with Ms. Albert was intended to address his concerns
with how CSI dealt with internal complaints." *Id*. Plaintiffs also have not demonstrated,
Community Solutions argues, that they were speaking out as citizens, given that Mr. Manning
spoke only to other Program Managers and Mr. Chelso "specifically asked that his meeting with
Ms. Albert be 'discreet.'" *Id*. at 12–13.

      Community Solutions also argues that Plaintiffs failed to provide evidence supporting the
claim that their right to freedom of association and right to petition the government were violated
when Community Solutions terminated both Plaintiffs to stop Mr. Manning from filing another
CHRO complaint. *Id*. at 13. To succeed on this claim, according to Community Solutions,
Plaintiffs would have had to prove that the individual in charge of terminating them knew or had
reason to know of Mr. Manning's 2015 CHRO Complaint or that Mr. Manning was soon to file
another complaint. *Id*.

      Plaintiffs respond that while Second Circuit case law holds "that administrative
complaints about discrimination against the individual complainant does not constitute speech on
a matter of public concern," administrative complaints alleging system-wide discrimination and
misconduct are considered speech on a matter of public concern. Pls.' Mem. at 9 (citing
*Saulpaugh*, 4 F.3d at 143; *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775 (2d Cir.
1991)). Plaintiffs claim to have "report[ed] illegal activity to their superiors and law enforcement

[that] is unequivocally protected speech." *Id*. Specifically, Mr. Manning and Mr. Chelso argue

that they "were involved in the reporting of a PREA violation in May 2018." *Id*. (citing Pls.'

56(a)(2) Statement ¶¶ 43, 57). In June 2018, CSI conducted an investigation into the alleged

PREA violation and referred it to the Connecticut Department of Correction for further action.

*Id*. (citing Pls.' 56(a)(2) Statement ¶ 144). Mr. Manning and Mr. Chelso both "questioned CSI's

policies as to handling PREA investigations," with Mr. Chelso "especially vocalizing his belief

that CSI was concealing criminal behavior and that its staff members should have been

investigated and arrested." *Id*. (citing Pls.' 56(a)(2) Statement ¶¶ 25–26, 59). Mr. Chelso also

"openly contemplated reporting the PREA violations to the Connecticut Department of

Correction[] and the Federal Bureau of Prisons, including for the PREA investigation that CSI

was conducting in June 2018." *Id*. (citing Pls.' 56(a)(2) Statement ¶ 60). Plaintiffs note that Mr.

Manning's previous CHRO Complaint on illegal discrimination "caused systemic change at CSI,

compelling CSI to give major pay-raises to all of its managers," which is allegedly proof that Mr.

Manning's grievance was not personal. *Id*. at 9–10 (citing Pls.' 56(a)(2) Statement ¶ 55).

    In reply, Community Solutions argues that Plaintiffs' 2018 PREA reports are not

protected under the First Amendment if they were done within the scope of their job duties, as

Plaintiffs appear to acknowledge when they claim that they were contractually obligated to file

the reports under the Code of Ethics. Def.'s Reply at 2 (citing *Weintraub v. Bd. of Educ. of City

Sch. Dist. of New York*, 593 F.3d 196, 201 (2d Cir. 2010), *cert. denied*, 562 U.S. 995 (2010)

("Specifically, *Garcetti* 'h[e]ld that when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline.'" (quoting

*Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)))).

Community Solutions argues that the 2018 PREA reports are not protected under the Connecticut Constitution. *Id*. at 2–3 (citing *Trusz v. UBS Realty Invs., LLC*, 319 Conn. 175, 204 (2015) (establishing that in order for speech made in the course of an employee's duties to be protected, the speech must have been a comment on "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety")). In support, Community Solutions argues that Mr. Chelso's testimony "unequivocally demonstrates" that he did not report illegal conduct to law enforcement, that he only "contemplated" reporting PREA violations, and that even if a report that Community Solutions mishandled PREA violations were protected by the Connecticut Constitution, "[Mr.] Chelso never affirmatively engaged in that conduct." *Id*. at 3 (citing Pls.' 56(a)(2) Statement ¶¶ 59, 60). As to Mr. Manning, Community Solutions notes that his testimony "describes how [Mr.] Manning . . . reported an undue familiarity incident to his supervisor," and "there is no evidence that [Mr.] Manning ever reported any illegal activity to anyone." *Id*. at 3 (citing Pls.' 56(a)(2) Statement ¶43).

The Court agrees.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ." *Connick*, 461 U.S. at 147–48. "Viewed objectively and as a whole," Mr. Manning's 2015 CHRO Complaint does not address matters of public concern. *See Ezekwo*, 940 F.2d at 781 (holding that a physician's complaints were not a matter of public concern because her primary aim was to protect her own reputation and not for the public welfare). Although Mr. Manning now notes that others like him received salary increases because of his 2015 CHRO Complaint, a review of his CHRO complaint shows that his grievances were "personal in nature and generally related to [his] own situation." *Id*. at 778, 780–81; *see also Davis v. City of Hartford*, 3:06-CV-1596 (JGM), 2010 WL 11561320, at

*12 n.31 (D. Conn. Apr. 6, 2010) (assessing the contents of a CHRO complaint to determine

whether the complaints fell within the protection of the First Amendment); *Coles v. Moore*, No.

3:04-CV-1623 (JCH), 2006 WL 2790436, at *4–*5 (D. Conn. Sept. 25, 2006) ("That [the

plaintiff] complained of treatment that could be construed as unconstitutional discrimination

does not transform [the plaintiff's] CHRO complaint into speech on an issue of public concern. .

. . The fact that [the plaintiff] made her complaints to the CHRO . . . also has little probative

value in determining whether [the plaintiff] complained about issues of public concern.").

      Except for mention of one other Black employee who was similarly paid lower than their

white peers, Mr. Manning's CHRO Complaint focused on his experience and emphasized that

despite a "final resolution" reached on September 24, 2014, which led to an increased bonus and

annual salary, he continued "to be less compensated than [a white peer] who ma[d]e[]

approximately $11,000 more annually than [him]." Ex. I ¶¶ 28–29; *cf. Saulpaugh*, 4 F.3d at 143

("Had [the plaintiff's] complaints to [the plaintiff's] supervisors implicated system-wide

discrimination they would have unquestionably involved a matter of 'public concern.'"). For the

same reasons, to the extent that Plaintiffs believe that their complaints concerning dissatisfaction

with the way Community Solutions managed their programs are protected speech, they are not.

      Plaintiffs' alleged "report[s] of . . . PREA violation[s]," also are not protected because

they were "made pursuant to [their] duties" *Garcetti*, 547 U.S. at 421. Public employees' speech

is protected when they speak "as a citizen upon matters of public concern." *Connick*, 461 U.S. at

147. Courts in the Second Circuit "ask two questions to determine whether a public employee

speaks as a citizen: (A) did the speech fall outside of the employee's 'official responsibilities,'

and (B) does a civilian analogue exist?" *Matthews v. City of New York*, 779 F.3d 167, 173 (2d

Cir. 2015) (citing *Weintraub*, 593 F.3d at 203–04). "Courts must examine the nature of the

plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. . . .
Other contextual factors, such as whether the complaint was also conveyed to the public, may
properly influence a court's decision." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (internal
citation omitted).

Community Solutions correctly notes that speech is not protected when it is "part-and-
parcel" of the employee's "ability to properly execute his duties." *Weintraub*, 593 F.3d at 203
(internal quotation marks omitted). The United States Supreme Court and the Second Circuit
have concluded in similar cases that an employee's statements and actions, "made pursuant to his
duties" have been a "controlling factor" in finding those statements and actions to be
unprotected. *Garcetti*, 547 U.S. at 424; *see also Weintraub*, 593 F.3d at 203 (holding that a
school teacher's grievance concerning the administration's refusal to discipline a student was
unprotected because the need to discipline his students was "an indispensable prerequisite to
effective teaching and classroom learning").

Plaintiffs' "reporting of illegal activity to their superiors and law enforcement," Pls.'
Mem. at 9, was done under their duties as employees at Community Solutions. The Code of
Ethics, found within the Personnel Policies, lays out expectations concerning employees'
"relationships with a client, their families and associates." Ex. F at 4. These expectations,
including the expectation that staff immediately report any personal relationship an employee
may have with a client, make clear that any PREA complaints fell within Plaintiffs' duties as
employees. *Id*.

Plaintiffs' claim that Mr. Chelso "question[ed] CSI's policies as to handling PREA
investigations" is not supported by the evidence. *See* Ex. H (e-mail from Mr. Chelso to Ms.
Albert requesting the 2014 meeting because Mr. Chelso had "a lot of questions and comments

33

regarding CSI and quite honestly need[ed] to know if [his] compass setting is aligned with [Ms. Albert's]"). Additionally, any comments Mr. Chelso made about CSI policies on handling PREA investigations fall within the ambit of his duties. *See, e.g.*, *Picott v. Chatmon*, 12 Civ. 7202 (ER), 2017 WL 4159900, at *6 (S.D.N.Y. Sept. 18, 2017) ("Notwithstanding [the p]laintiff's after-the-fact claim that the purpose of his email was to voice a public concern, it is evidence that the overriding concern of [the p]laintiff's email was to air his personal dissatisfaction and frustration with a superior.").

The fact that any alleged comments were directed at a Community Solutions officer, resulted from knowledge gained through Mr. Chelso's employment, were initiated over workplace e-mails and during conversations about the workplace, and concerned Mr. Chelso's job, all also weigh in favor of finding that Mr. Chelso was speaking within the scope of his official duties. *See, e.g.*, *Airday v. City of New York*, 131 F. Supp. 3d 174, 179–80 (S.D.N.Y. 2015) ("Courts consider several factors when attempting to determine if a public employee spoke pursuant to his official duties, including: (1) the plaintiff's job description; (2) the persons to whom the speech was directed; (3) whether the speech resulted from special knowledge gained through the plaintiff's employment; (4) whether the speech occurs in the workplace; and (5) whether the speech concerns the subject matter of the employee's job." (internal citation omitted)). Mr. Chelso's alleged comments were thus also made through employment-related channels, were not conveyed to the public, and have no relevant analogue to citizen speech. *See Weintraub,* 593 F.3d at 203–04 (filing a union grievance is a channel of discourse unavailable to non-employee citizens and has no relevant citizen analogue).

In any event, as discussed below, there is also no evidence that anyone at Community Solutions was aware of Plaintiffs' alleged reporting of PREA violations.

### 2.  Plaintiffs' Alleged Absence of Evidence of a Causal Connection

Community Solutions also argues that even if Plaintiffs did engage in protected activity, they have "failed to provide any evidence of a causal connection between their claimed protected activity and their termination," Def.'s Mem. at 10, either through direct evidence of retaliatory animus or evidence of temporal proximity between the protected activity and the adverse action, *id*. at 14 (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)).

As to evidence of retaliatory animus, Community Solutions notes that Plaintiffs could not "state with certainty that Ms. Albert played any role in the decision to terminate them," and that Community Solutions has shown that Ms. Black, who "initiated and conducted the investigation and ultimately recommended [P]laintiffs' terminations was not aware of the alleged protected activities." *Id*. at 14. According to Community Solutions, Plaintiffs have not provided any evidence showing that Ms. Black knew that Plaintiffs had previously engaged in protected conduct. *Id*.

Moreover, Community Solutions argues, the three-to-four-year gap in time between the alleged protected conduct—Mr. Manning's 2015 CHRO Complaint and Mr. Chelso's June 2014 conversation with Ms. Albert—and Plaintiffs' termination "is insufficient to demonstrate causality necessary to raise an inference of retaliation." *Id*. at 15 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *D'Andrea*, 765 F. App'x at 606; *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 223, 233 (2d Cir. 2015); *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 26 (2d Cir. 2011) (summary order); *Burkybile v. Bd. Of Educ. of the Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005)).

Plaintiffs respond that causation is satisfied through evidence of temporal proximity, because both Mr. Manning and Mr. Chelso reported a PREA violation in May 2018, which led to

the June 2018 investigation and the "almost concurrent[]" investigation that CSI opened into Plaintiffs. Pls.' Mem. at 10 (citing Pls.' 56(a)(2) Statement ¶¶ 43, 44, 45, 56, 57). Plaintiffs add that Mr. Chelso "had been indicating that he was contemplating . . . making reports to appropriate law enforcement over CSI's misconduct," *id*. (citing Pls.' 56(a)(2) Statement ¶¶ 25–26, 59–60), and that "CSI had a practice of threatening employees with termination if they reported PREA violations," *id*. at 11 (citing Pls.' 56(a)(2) Statement ¶ 61). They were both terminated "shortly after CSI began investigating the PREA violation." *Id*. (citing Pls.' 56(a)(2) Statement ¶¶ 49, 58).

In reply, Community Solutions argues that Plaintiffs did not provide evidence supporting their claim that Ms. Black was aware of Mr. Chelso's 2014 conversation with Ms. Albert or Mr. Manning's 2015 CHRO Complaint. Def.'s Reply at 4 (citing Pls.' 56(a)(2) Statement ¶ 34). Defendant argues that instead of providing evidence of a link between the 2014 and 2015 events, Plaintiffs are now claiming Mr. Chelso's "serious contemplation" of filing a report in 2018, "an allegation that is conspicuously absent from their Amended Complaint," triggered Ms. Black's investigation and led to Plaintiffs' termination. *Id*. at 4. Still, Plaintiffs have not provided evidence "ever had any reason to suspect, let alone that she actually knew what [Mr.] Chelso was thinking of doing[.]" *Id*.

The Court agrees.

Plaintiffs fail to show causation through evidence of retaliatory animus, or through circumstantial or temporal evidence. *See D'Andrea*, 765 F. App'x. at 605 ("Causation can be proven (1) directly 'through evidence of retaliatory animus directed against the plaintiff by the defendant'; or (2) indirectly either (a) 'by showing that the protected activity was followed closely by discriminatory treatment,' or (b) 'through other circumstantial evidence such as

disparate treatment of fellow employees who engaged in similar conduct.'" (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000))).

Plaintiffs' claim of retaliatory animus is unsupported by any evidence. The evidence presented consists only of speculation concerning Ms. Albert's sentiments towards Plaintiffs because of any alleged comments or complaints made while at Community Solutions. *See, e.g.*, Chelso Dep. at 51: 21–23 ("Q: So did Sherry Albert have any involvement in the investigation, to your knowledge? A: I have no idea. I would just guess that she was happy with the – (technical difficulty)."); *id.* at 59:7–13 ("Q: So why do you believe your termination was unlawful? A: It was either retribution from my prior conversations with [Ms. Albert], retribution because of Mark's prior case, or because we're the oldest people in the house. Unless somebody admits to me the real reason, I got to go with those three."); Manning Dep. at 39:5–13 ("A: . . . Once I saw Sherry Albert in the room, I wanted to consult my attorney. Q: And why is that? A: Because I don't trust Sherry Albert. Q: Why don't you trust her? A: Because I've had a lot of – I've had several negative interactions with Sherry Albert. And I just don't trust her. And I also found it strange that the COO of Community Solutions would be in on a termination."); *id.* at 44:5–9 ("Q: Okay. Other than her presence during your termination meeting, do you know whether or not [Ms. Albert] played any other role in the investigation, such as interviewing any of the staff or anything like that? A: I don't know. I wasn't working for CSI."); *id.* at 50:5–10 ("Q: Why do you contend that your termination was unlawful? A: Because they didn't tell me specifically what I did. And I know I didn't do anything to get terminated. Like you said, there's specific reasons why you can terminate an employee. And I didn't do none of those."); *id.* at 60:7–14 ("Q: Had you ever applied for a promotional position after your 2015 CHRO Complaint? A: No. Q: So how were your employment prospects or your opportunities to be

promoted limited? A: I can't think of right now specifically why. I cannot recall. But there was something going on back then."); *id*. at 64: 12–20 ("Q: . . . So why would you believe that the noted policy violations were false? A: Because I never – I never did anything in my position or responsibility, code of ethics or relationship with other employees. I never had a relationship with other employees. I never had a relationship with another employee. I – the utmost – I practiced the utmost employment ethics, personal ethics. And my position and responsibilities, there was no issues with my responsibilities as Program Director."). To the contrary, the evidence shows that Mr. Chelso continued to be placed in the roles that best suited him, even after his 2014 conversation with Ms. Albert. Pls.' 56(a)(2) Statement ¶ 4.

Causation also cannot be inferred from circumstantial or temporal evidence. Other employees faced termination or suspension because of the investigation that led to Plaintiffs' termination. Plaintiffs, however, have not linked the sanctions imposed on those employees to any similar claims of retaliation. Plaintiffs' only evidence relies solely on their claims that Ms. Albert was determined to retaliate against them for complaints and comments made in 2014 and 2015. *See, e.g.*, Manning Dep at 51–53 (alleging that Ms. Albert discriminated against and intimidated Mr. Manning "in the past," and specifically when Mr. Manning was filing his 2015 CHRO Complaint). The three-year gap between the alleged complaints and comments and Plaintiffs' termination in 2018 undermines the causation element of Plaintiffs' claim. *See D'Andrea*, 765 F. App'x at 605 ("While we have declined to draw 'a bright line to define the outer limits beyond which' temporal proximity may be established, we have generally held that causation can only be inferred after the passage of a few weeks or months, . . . and have held that a delay of more than a year is fatal to a showing of causation . . . ." (quoting *Gorman-Bakos*, 252 F.3d at 554)).

As to Plaintiffs' alleged 2018 PREA complaints, there is no record evidence that Plaintiffs filed any PREA complaints in 2018. Mr. Chelso appears to have never filed any PREA complaint at all. *See* Chelso Dep. at 78:25–79:5 ("Q: Did you ever at any point give any indication that you were about to tell – go to the DOC or to the Federal Bureau of Prisons – A: No. Q: – about the PREA violations in 2014? A: No."); *id*. at 82:12–15 ("Q: . . . I believe you testified earlier that you did not tell [Ms. Albert] you were going to go to the DOC; is that correct? A: Correct."). And the 2018 PREA complaint Mr. Manning was allegedly involved with, originated with a subordinate, and Mr. Manning simply raised it up the chain of command to his supervisor, Tom O'Connor. Manning Dep. at 34:18–21 ("Q: You just testified that you reported the [2018] PREA issue to Tom [O'Connor]. How did you become aware of that issue? A: It was reported to me by the Associate Program Director.").

Accordingly, summary judgment can be granted on this claim for this reason—lack of proof of causation from which a reasonable jury could infer retaliation—alone.

### 3.  Plaintiffs' Alleged Failure to Establish Pretext

Finally, according to Community Solutions, Plaintiffs "have failed to produce any evidence that the [D]efendant's proffered reason for their termination was pretext." Def.'s Mem. at 10.

Community Solutions claims that even if there are questions of fact over whether Plaintiffs can establish a *prima facie* case of retaliation under § 31-51q, summary judgment is appropriate because Defendant "has established a legitimate, non-retaliatory reason for terminating [P]laintiffs." *Id*. at 15. Specifically, an investigation found that Plaintiffs violated several of CSI's Personnel Policies and their Code of Ethics by "creating a hostile work environment and retaliating against staff at the Chase Center for reaching out to HR." *Id*. at 16.

Community Solutions argues that "[v]iolation of employer policies is a legitimate reason for an employee's termination." *Id*. (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997); *Greenfield v. McDonald's Corp.*, No. 3:10-CV-40 (VLB), 2011 WL 3859717, at *7 (D. Conn. Sept. 1, 2011); *Weisenbach v. LQ Mgmt.*, No. 3:13-CV-01663 (MPS), 2015 WL 5680322, at *6 (D. Conn. Sept. 15, 2015)). Ms. Black, who obtained statements from approximately twenty staff at the Chase Center, "received information sufficient for her to believe that the [P]laintiffs were belittling and harassing the staff at the Chase center in an effort to deflect HR involvement." *Id*.

Community Solutions thus concludes that summary judgment is appropriate because Plaintiffs have not shown that the stated nondiscriminatory reason is a pretext for discrimination, which can only be done by showing that the reason was false and that discrimination was the real reason. *Id*. at 16–17 (citing *Bayan v. Sullivan*, No. 3:14-CV-00528 (VAB), 2016 WL 5745088, at *3 (D. Conn. Sept. 30, 2016)). According to Community Solutions, nor have Plaintiffs shown, as is required for establishing pretext, that "the 'asserted neutral basis was so ridden with error that the employer obviously not have relied on it.'" *Id*. at 17 (citing *Dister v. Cont'l Grp., Inv.*, 859 F.2d 1108, 1113 (2d Cir. 1988)). Instead, Defendant argues, "[a]ll [P]laintiffs have presented as evidence of pretext is their opinion that Ms. Black's investigation was poorly executed." *Id*. This disagreement, they argue, is insufficient to create a genuine issue of fact because disagreements with termination decisions, and even evidence that "'the decision was objectively incorrect or was based on [a] faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.'" *Id*. (quoting *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008)). "Instead, a 'plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate,

non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Id*. (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

Community Solutions further notes that Plaintiffs "were not the only two Chase Center employees issued discipline after Ms. Black's investigation. Two other employees were terminated while two others were issued warnings," and there is no evidence that these other employees had engaged in protected activity or that Plaintiffs were treated differently. *Id*. at 18.

Plaintiffs argue that CSI was motivated by a retaliatory pretext as evidenced by its failure to follow "standard operating procedures for terminations," such as creating factual summaries and questioning relevant employees, providing an explanation for being placed on administrative leave, and including the employee's direct supervisor in the termination procedure. Pls.' Mem. at 11–12 (citing Pls.' 56(a)(2) Statement ¶¶ 51–53). Plaintiffs claim that none of these procedures were followed in their termination, and that CSI "summarily placed them on leave and terminated them without ever telling them why." *Id*. at 12 (citing Pls.' 56(a)(2) Statement ¶¶ 51–53, 56, 58).

Plaintiffs further argue that Ms. Black and Ms. Albert's refusal to allow Mr. Manning to obtain counsel before answering their questions at the June 22, 2018 meeting is further proof of pretext. *Id*. (citing Pls.' 56(a)(2) Statement ¶¶ 48, 54). They underscore that "[i]nstead of respecting his wishes, they both attempted to coerce him into answering their questions without counsel, and they terminated him when he refused to succumb to their coercion." *Id*. (citing Pls.' 56(a)(2) Statement ¶¶ 48–49).

Community Solutions contends that Plaintiffs' pretext argument is insufficient because CSI's deviation from standard operating procedure is insufficient to demonstrate pretext. Def.'s

Reply at 4 (citing *Rodriguez*, 644 F. Supp. 2d at 187). Moreover, they argue, "any question of fact that may exist as to CSI's reasons for terminating [P]latiniffs' employment is extinguished by the fact that other staff at the Chase Center, who did not engage in the same types of alleged protected speech as the [P]laintiffs, were also disciplined." *Id*.

The Court agrees.

Plaintiffs' mere disagreement with the investigation is insufficient to demonstrate pretext. *See, e.g.*, *Rodriguez*, 644 F. Supp. 2d at 187 ("[T]he Court recognizes that the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."). Other than Plaintiffs' unsubstantiated deposition testimony, there is no evidence from which a reasonable juror could conclude that Community Solutions' reasons for terminating them were mere pretext.

Accordingly, summary judgment will be granted as to this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.

The Clerk of Court is directed to enter judgment in favor of the Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut this 15th day of July, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE